Thank you, Your Honor. May it please the Court. My name is Don Cruz, and I'm here representing the Plaintiff Appellant Alexander Stross. Our case began with the expectation that it would be what some of the cases we cited called a typical copyright infringement claim. Mr. Stross is the copyright owner. He participates in a local MLS with the understanding that that entity will issue limited, narrow, revocable sublicenses to those who participate to make limited uses. He saw, after Redfin entered the Austin market, they were using photographs in a way that he understood actresses would not have authorized, were inconsistent with the way MLSs had operated in the past. And he brought a copyright claim alleging that that violated his exclusive right to control the photographs and that Redfin was not licensed. Two things made this very atypical. The first one may not be obvious is that Redfin, rather than try to prove up that normal kind of chain of sublicenses through actress, has chosen to base its affirmative defense on a different supposed license that Redfin claims came directly from Mr. Stross and from every other member, bypassing all the limitations of the actress rules and going directly to it. So by basing it on a different license than we expected, it's created this odd situation where we are denying the very existence of the license that's the basis for the motion for summary judgment. The second factor that makes this very atypical is the district court decided this case on a ground it called standing, sort of copyright standing, deciding that, and I think in fairness, the district court was trying to find a way to have this case have fewer implications. By trying to say that Mr. Stross had somehow been stopped by its reading of these agreements from denying this broader license, I think it was trying to avoid having ripple effects. But its standing holding is actually far more sweeping than anything in the case. It says that a copyright holder simply cannot sue someone who's a down-and-true sub-licensee. That's, you know, it turns to that standing question as the first substantive point of the argument. And I don't want to spend too much time on this unless the court does have questions, but it's really a question of federal law, the statutes, and Section 501B sets out who has standing. There's no dispute that Mr. Stross is the one who holds the exclusive right under copyright here. He has statutory copyright standing, and that's really where the court's inquiry on the standing question should end. So the question becomes, what does the court do with the remainder of the case? We have the standing analysis of the district court was very tangled in its reading of these license agreements. Redfin has presented and fully briefed its license defense as an affirmative defense that would, it argues, support affirmance here. As the movement on summary judgment, Redfin is the master of what grounds it presents. It has chosen to focus only on this argument that Section 7.10 creates this broad bypass license on its behalf. So all we need to do to survive summary judgment and to return back to the trial is to disprove their attempt to establish the existence of this very, very broad license from Section 7.10. In the course of doing that, we talk about lots of other provisions both in the Actus Rules and in the specific documents that Redfin signed, their PCAA and their CTA. I mean, 7.10, it is broad. I mean, the text is fairly sweeping. It grants actress and its service providers and licensees, dot, dot, dot, the right and license to use these uploaded listings. And I wonder how that all-encompassing language doesn't include Redfin. I want to address that from two directions. The first is by starting with the 7.10 itself, sort of taking their argument at face value as you framed it. Rule 7.10 begins by describing what it's doing as a warranty and license to actress. It goes on to – it has that language with that parenthetical and service providers and licensees in the parenthetical. That reading, we suggest that that is an acknowledgment that actress does have the power to grant sublicenses as it chooses fit. If you continue to read the scope of what is granted, it is more consistent with our reading than with Redfin's reading. For example, it describes that the scope of the license – it goes on to say the scope of the license is to use, copy, and create derivative works of it and authorize its use, copy, and creation of derivative works. So it's both a power to use yourself and to grant a sublicense. So why would actress need this explicitly spelled out power to grant a sublicense here if the word licensee had already carried all that freight, had already granted these copyrights all the way through the chain? We think that by giving actress the right to use it and to authorize those uses, it's consistent with our view. This is describing actress making a choice, as we point out in our brief. The word authorize suggests that actress is making some sort of a decision about this. Under Redfin's reading, actress would not have any gray area at all. If it signed a license agreement with another entity for one photograph to use one time for one purpose, according to Redfin's reading, very strict reading of the word licensee, that person would have the right to the entire actress database sort of free of copyright restrictions, which subverts a number of parts of the actress rules. A second part of 7.10 that also is inconsistent is this or such other use language that the district court seized on as a kind of intensifier to expand the scope of the grant. As we brief, it's actually the lead-in to a clause that describes a sort of notice and opt-out provision that actress can use if it wants to go back to its members to describe some kind of new use it's going to make of these materials. Under our reading, this is a description of actress's role. Under Redfin's reading, for that or such other use to have any effect, Redfin would have to be giving notice to all the actress members. As Redfin has sort of explained, it's viewed that this is a grant from every member to every other member. It creates an enormous amount of mathematical complexity of these notices and opt-outs that would be flying around. In our view, this is all going through actress. It's much, much simpler. It makes much more sense as a reading. If you look at the actress rules as a whole, or actually, I think the PPS, if you look at the actress rules as a whole, the whole section of rules from 7.1, 7.2, 7.3, these are all about keeping the database confidential. All of these rules have this idea of controlling public access and use of these materials, which are both valuable to the members and have privacy implications for the homeowners, both people who have lived in houses before, having photographs taken of their houses. Part of what makes actress work is the confidence that its members have and their customers, the homeowners have, that if they let pictures be taken of their home, that those materials will be kept as confidential as can be, that it will not be reused for these other purposes later. Under Redfin's reading, every single licensee who's ever had any kind of license from actress would be able to reuse those materials. At most, they would face some sort of a tiny penalty that actress might levy against them, if they happen to still be a parent member. Redfin's reading is really inconsistent with the entire structure of the actress rules, trying to keep confidences. I think, really crucially, Redfin's argument is inconsistent with the text of the very document. But if you're allowed to use these pictures to value the properties and not just to sell them, I could see that there would be a temporal limit if I'm trying to sell my house and I sell it tomorrow, there wouldn't be a reason for the picture after that. But if you're also using it to value my neighbor's house, then the picture could be up there in perpetuity, and my confidentiality interests seem a little bit limited, given that it's going to keep me, at least for some period of time, I guess eventually it becomes stale, but for some period of time it's going to be used to value my neighbor's house and the house down the street and whatever. Well, the way the rules try to address that is by limiting the use specifically of sold photographs. They are not supposed to be given to customers, they can be shown or used as a backup material, but only a certain number of photographs. But this is on the internet. The MLS data is not widely available on the internet. When a local broker sets up a website with real estate listings under the provisions of this rule, they cannot put other brokers' sold listings on there. Okay. They can, if they're working with a particular client, refer to a certain number of those. But I thought ordinary people can access Redfin's website. They absolutely can, which is one of the crucial ways that Redfin's uses go beyond what any legitimate scope of license may have. Okay, but if I'm looking to buy a house, then doesn't it benefit the seller if I look on Redfin and I see a house and I can look at the pictures and all of that? That would be consistent with Mr. Strauss's understood use, right? That I'm looking for a house and I see it on Redfin or no? If it's an active listing. Okay. But if it's a house that is not an active listing. But then if I'm trying to figure out, well, is the house that's for sale at 100 Main Street really worth what they're charging, and I see, well, the house at 102 Main Street sold for X, then that's helpful to me in deciding whether to buy a house. And helpful to the seller at 100 Main Street in showing that their house is competitive. Or maybe not. It certainly might be a valuable thing to know. Certainly Redfin is marketing to its customers this is a valuable thing. But it's pertinent to the, Strauss thought this was going to have to do with real estate selling and value, right? That's what he understood his pictures to be used for, right? He understood the licensee credit. So if that's what it's being used for, I'm benefiting because I can figure out whether the house at 100 Main Street is worth what they're charging or whatever by looking at a prior sale. Isn't that what's happening here? And really the only exception to that arguably is this whole thing about post it on Instagram or whatever. But this past listing, I don't see why that is inherently not consistent with the real estate value and sale use that Strauss thought his pictures were being used for. From a copyright perspective, his interest, he holds the exclusive right to stop anybody who's not licensed from using his materials. But he granted… Actress a license. A somewhat broad license. And my point is I understood it to be not just while 102 Main Street is for sale you can list the picture and once 102 Main Street is sold you have to take it down. That and the license he granted. So it was a broader license. A broader license. Okay. So then actress granted some kind of license to Redfin. It can only be limited by his license to actress. In other words, if he had granted a very narrow one they couldn't grant a broader one. But we start there. So would you agree with me that his license to actress would encompass a sold home that's being used to determine whether a currently listed home is really worth that as a comparator? Yes, I think of that. Okay. That's right. So other than this thing where they're telling everybody to post it, what is it that Redfin's doing that's inconsistent with that? With the license grant to actress? Yes. Well, the use on – well, their photo sharing service that they set up where they were having people with kitchen ideas or – Right. So that's the – well, that's what I was saying. That's the example that we point to that even actress couldn't do that. But from the perspective of what Redfin's defense here is, they – the specific document they signed that's a license is inconsistent with their argument. They're asking the court to say that this PCAA at tab seven of the record excerpts grants them this unlimited license to the full extent of actress. But in fact, the words used in paragraph two in the middle of that first page – Absolutely. I was simply starting at the place of Strauss to actress. That's right. Because if that was very limited, then we would be done because actress couldn't go broader than Strauss gave them. That's right. Your argument is they gave them a certain degree of license and then narrowed it down to Redfin, and that's where the district court, in your view, got astray because it said, well, that's filing a state court lawsuit on a contract you're not a party to. And your argument is if you're claiming a license, you have to be within the license and you're not. Right. That's exactly right. Okay. And that does touch on an important point, which is that even if Redfin persuades the court that it has carried its burden as the movement of affirmative defense to prove up the existence of that broad license for itself, we still should have overcome summary judgment because we do have evidence of uses by Redfin – That's the photo sharing thing. For the photo sharing. Okay. All right. Well, you've reserved your revolt, then. Thank you. Thank you. All right. We'll shift to Redfin. Mr. Leffler. I was about to say good afternoon, Your Honors, but it is still morning. My name is Chris Leffler, and I represent Apelli Redfin Corporation today. Your Honors have hit on a few of the issues, and counsel here has hit on a few of the issues. I think some background, if I could just take a minute or so to talk about Redfin and MLS a little bit to set some context, I think it would be very helpful to the court in understanding the license and the arguments that are being made today. Redfin is a real estate broker, and real estate brokers hire real estate agents to help people sell and purchase homes. Redfin, like Keller Williams, Mr. Strauss, Century 21, and a host of other real estate brokers, make their money through commissions through the sale of homes. They don't make their money through web views, through click-throughs, or through advertisement on their website. They are real estate agents who sell and purchase homes. To accomplish that, they have to join MLSs. MLSs are cooperatives of real estate agents and real estate brokers who agree to share information with each other for the benefit of all. If information about the homes that are for sale was not made available broadly to all of the people in a market who were looking to purchase homes, it would be very inefficient to try to purchase a home in a market, because you would have to go to each and every broker who was listing a house for sale in order to know what was available and what was out there. MLSs create a cooperative whereby the agreement is, I, as the seller, will make my information available to the MLS, publicly and broadly disseminate that information, where I, as the purchaser, can locate that information, look at it, compare information, and really understand what house I want to buy and what's available on the market. To do that, MLSs come up with a broad set of rules. Those rules range from things like where I can put a for sale sign on a property, how I use lockboxes, and what becomes of the information that I upload as a seller into the MLS database. That really brings us to what we're talking about today, which is Rule 7.10. At issue today is the use of approximately 1,800 photographs taken by Mr. Strauss that were uploaded into the Actors Database. Those 1,800 photographs are a very small portion of approximately, I forget the numbers of today, but it's well in excess of 5 million photographs that exist in the Actors Database. Nationwide, in Redfin's database, from the 84 MLSs that it's a part of, it has over 56 million photographs. Given the amazing amount of potential exposure that could exist if one like Redfin were subject to copyright infringement claims if a photograph was used improperly, the MLSs take a very broad view of how the licenses that are granted to it and that it grants to its users are issued so that the MLSs can function. MLSs can change their rules without worrying about the past licenses that were brought in. Broker A and Broker B can avoid the types of disputes that are here today because I know that rather than being sued for infringement, I know that the rights for photographs have been vested to me. The answer is to go to the MLS if you see a rules violation and deal with the MLS. What happens is a very broad license is granted. As you've mentioned, Rule 7.10 is extremely broad, and the language is clear. It says, by uploading, the participant thereby does grant Actors and its service providers and licensees an irrevocable worldwide paid-up royalty for a free right in license to use, copy, create derivative works, and to authorize its use, copying, and creation of derivative works for any purpose consistent with the facilitation of the sale, lease, and valuation of real property. As Council properly pointed out, Redfin does read that as giving Redfin a direct license to those photographs. That makes sense in light of how MLSs work and how information is shared within an MLS and the purpose of an MLS to broadly disseminate these photographs for the purposes of valuing, selling, and leasing real property. The MLS then has the ability to police itself and to police its members, and it does so in myriad ways, but mainly through rules. I heard today, which we saw in the papers, a claim that Redfin is trying to argue that Mr. Strauss has lost his copyright protection. That's just simply not the case. What Mr. Strauss has lost is the ability to enforce use of the photographs within the license that he granted to Actors and its members. Mr. Strauss is always free to enforce his copyrights against those who do not have licenses, and he is free to enforce his copyrights against those who exceed the scope of their license. Okay, let me ask you this as kind of a matter of first principles. So if we do not accept the argument that the license from Strauss to Actress is itself a license to Redfin, and instead we say Redfin needed some sort of license from Actress, then in your defense of I'm a licensee to the copyright claim, you would have to prove, wouldn't you, that your use is consistent with both the license to Actress and the license from Actress to you to prove your defense. Would you agree with that if, in fact, your original argument about it's a license to us, too, is not found to be accurate? So I would agree with half of what you just posited. Specifically, I would agree that Redfin's use would necessarily have to be within the broader grant to Actress. But whether or not Redfin's use exceeded the scope of the license that Actress granted to Redfin, I don't agree that that is necessary. That would be an issue between Redfin and Actress, not between Mr. Strauss. But it's your defense. And you have to create two links to get to your defense. Your link is John gave it to Jane, and Jane gave it to me. And if Jane didn't give it to you, you can't assert that. So that's what I'm trying to say. I'm having trouble as a matter of first principles. I understand the district court thought this was a matter of standing. You're suing under state court license and contract claim. That's not what Mr. Strauss is saying. He's saying for you to assert this defense, you've got to create both links or else you don't have it. Oh, you're just hanging out here, and all you've proved is my license to Actress, but you haven't proved Actress gave you anything. And if Actress didn't give you something, you ain't got anything. Right, so Actress is on record through the declaration of Beth Gatlin that Redfin did have a license from Actress starting in 2010. And what Actress had or what Redfin had from Actress is the right to display the MLS database. I think maybe an analogy here would work. Let's assume for a moment that I own a 10-story building, and I sublease five of those floors to your owner. And in my sublease, I say I am subletting, I'm leasing this five floors to you for purposes, any purpose consistent with retail or commercial use or residential use. And I give you the right to sublicense it. You then go out and sublicense to Persons A, B, C, D, and E, but you restrict their use in the sublet to only residential use. Well, now if Person E starts using that space for commercial purposes, I, as the original owner, don't have the right to go and enforce that. Why not? Because I have given up that right. But you gave it up to a specific person who then did not, in turn, give it up to someone else. And so that someone else doesn't have anything to hang onto to say, here's where I'm getting – they're just a trespasser, in essence, because they don't have a right given to them by anybody. So their use is consistent with the rights that I gave up in floors 5 through 10. But it's not consistent with anything they were given. So they're a trespasser as far as – if they were given residential rights and now they want to open a store, they don't have that right from anybody. They don't have it from my licensee and they don't have it from me. So I don't get – I don't – that's my problem with first principles. I don't understand the argument that you can go beyond the license you were given as long as you're not being sued by your licensor and only by the ultimate licensor. Well, my licensor, Actress, has never made a claim and when asked has never said that we, Redfin, have exceeded the license from Actress. Well, I don't think Actress gives a flip. I mean that doesn't help us. The question is Mr. Strauss. He's got his copyright. You agree he still has it. And the question is can he sue you for a copyright violation? And your answer is no because I have this license and I'm saying if it doesn't say X, then you can't wave it around. And I'm not understanding what's wrong with that analysis. Point me to the case that shows that my analysis is wrong. Maybe that will help me. Your Honor, I can't point you to a case that says your analysis is wrong because I don't believe one exists or we would have cited that a long time ago. What we can point to is the license that we have. And the license that we have, one, I think that the broader license applies. But sticking with the license that we're discussing here, the secondary approach, even assuming that everything that Mr. Strauss has said about that license, that that license is subject to the Actress rules. Well, Mr. Strauss is pointing to some very technical things. For instance, you mentioned sold properties, the showing of sold properties. The Actress rules allow the showing of sold properties. They only— Robert, what about this photo sharing? Like look how you can remodel your kitchen. Look at Katharina Haynes' kitchen that was in a house that was sold six months ago. What a lovely kitchen. How does that have anything to do with the selling or the valuing if we're just focusing on what a nice kitchen it is or look at this beautiful microwave that she has? And I don't understand that. Well, Your Honor, that's actually—you have to, again, think of the whole context of what's going on and what Redfin does. Let's go back to the pre-Internet days. Pre-Internet, what people did is they would clip things out of magazines. They would go to various houses that would sell. They would take the flyer, and they'd put all this information in a manila envelope. And when they were meeting with their real estate agent and were discussing what they liked, they would pull out that manila envelope, and they would say, These are the types of bathrooms I like. These are the types of kitchens I like. And this is the architectural style of a home I like. This collection is nothing different than that except it's online. This is an opportunity for people who are looking to purchase real estate to share information with their spouses, with their agents. But this doesn't limit—this notion of what a nice kitchen doesn't limit us to buying and selling real estate. I mean, I understand what you're saying, the manila folder where it says, I'd like a house that has a kitchen that looks like this. But this isn't—Redfin isn't limiting it to that. So I could just say, well, boy, that's a nice countertop. I guess I'll just go get a countertop like that in my existing house that I'm not going to sell or buy forever. It doesn't—Redfin is not required to limit it to that. Redfin is—Redfin is able to show those properties for any purpose consistent with the sale, purchase— But what I'm saying is, is it consistent with, at least, or is there a fact question whether that kind of use— because people use pictures on the Internet for really weird reasons. And so this isn't, in my view, furthering the purpose of buying or selling a house if you just say, look at—share these photos for kitchens. Then we're getting beyond that. We're not saying share these photos to find a kitchen in a house for sale. And yes, if you're using copyrighted pictures, you do have to be careful not to go beyond what the purpose was. So you're kind of saying anything that further fuels the excitement about houses is somehow related to buying and selling houses. And that strikes me as not something I can accept as a matter of law. Maybe a jury would accept that. I don't know. The court found, having looked at the—the court below, having looked at the entirety of the record, found that Mr. Strauss had not shown any actual infringing uses. So there actually is not in the record—there is no evidence in the record of these sharing buttons having been used by anyone other than Mr. Strauss, Redfin, or one of their agents. The record is just void of that information. So without that type of evidence, there can be no—there is no direct infringement, so there can be no indirect infringement. So Redfin, by just having the buttons— So you can't infringe by telling someone else to do something inconsistent, like please take this picture and post it on your class project about kitchens. It has nothing to do with buying or selling those things. So if I actively go out and—under the Grokster case, the MGM v. Grokster case, if I actively go out and advertise and encourage people to infringe photos, then perhaps I could be liable for indirect infringement. But there's no evidence in the record that that happened, right? Redfin has never gone out and affirmatively encouraged people to infringe. There are many non-infringing uses for that. One, Redfin owns a substantial number of the photographs on its website. Redfin has licenses directly from photographers for a substantial number of the photos on its website. Many of the MLSs that Redfin deals with specifically allow— I mean, all of a reason. I know, like, when you go to a professional photographer and they send you ten pictures of yourself and for you to pick one, they have a big line across them saying, you know, copyright or something that you wouldn't be able to just take and copy. So you can pick the one you want, and then they license you that one, and then you can use it, or maybe they don't. Maybe they just sell you that picture for $30 or whatever, and you're done. So it seems like if you own all these pictures, so you have 56 million and you own 55 million of them, all the more reason to put some kind of stamp on the million you don't, say, you know, don't use or copyright it or whatever. Your Honor, that would be wonderful, but Redfin is specifically prohibited by the various MLSs from altering or changing information within the listings in any manner. So Redfin cannot stamp photos. Redfin cannot—and Redfin is also prohibited, under the Actors Rule specifically and other MLS rules, from actually removing certain listings from its database. Redfin is at the mercy of the MLSs to ensure that it has the rights to use its website in the way that it does. And the MLSs actively police Redfin to make sure that that's happening. And if they're not in compliance, then there are procedures that are gone through to make sure that they come back into compliance. And at the end of the day, as a real estate brokerage firm who needs to participate in these MLSs, the death knell of Redfin's business would be to be excluded from the MLSs. Let me ask you, just to clarify one thing, are you arguing that Redfin's sort of social media share buttons, the share buttons on photographs of already sold properties, falls within Rule 7.10's restrictions on use? Absolutely, Your Honor. One, many MLSs specifically allow for share buttons. Two, Actress is silent on the issue. But it falls within the restriction on uses described by Rule 7.10? Yes, because sharing those properties, again, is very useful to people in communicating with their agency, communicating with their spouses when they're making decisions about what properties they want to buy. Even though they're already sold properties? Yes, because that allows them to, one, find architectural features they like, two, to find styles of kitchens they like, and three, it helps them assist in valuing properties. What is a property like the one I'm looking at worth when having been sold in a similar neighborhood at a similar time? Okay. So if Your Honors don't have any other questions, I'm about out of time. I would just like to say, in the end, this case boils down to a very simple fact. Did Redfin use these photographs in a manner that was supported by the various licenses that have been discussed? There's been two licenses. There's one license discussed with two potential ways to view that license. One is directed for Mr. Strauss through 7.10. One is from Mr. Strauss to Actress under 7.10, and then from Actress to Redfin. And I posit to you that under either reading of the licenses, Redfin was within its rights to use the photos, and the district court should be affirmed. All right. Thank you, Mr. Glickman. Back to you, Mr. Cruz, for rebuttal. Thank you, Your Honor. I'll begin where Redfin ended. We don't see this as the case with one license with two interpretations. It is one set of documents, but Redfin is alleging a different license than the sort of two-step license. But fundamentally, if the photo sharing, and, I mean, I'll admit my ignorance. I don't really understand how all that works. But if the photo sharing is so that I can say, look at the house at 100 Main Street that was just sold. I want a house just like that. If that's a consistent use, then regardless of who licensed whom and what, then what's the problem? Well, the problem is that it's an unlicensed use, that Actress did not give it. And so trying to step outside of copyright law for a minute to address, I think your concern is why would we care about this? No, not why would we care, but if the argument is this exceeds the license because it's beyond the real estate valuation and sale, he's giving an argument for why it's within the real estate valuation. I mean, that's an argument. It's not your only argument. Actress could authorize social sharing. They absolutely could. So the breadth of the license to Actress would allow them to do it. You're just saying the license to Redfin doesn't. It's specifically on page 541, the Redfin CTA, the specific agreement that talks about what Redfin's license is. Ask what website the photos will be on. It says www.redfin.com. There's a checkbox for will it be syndicated to other websites, and if so, which? It's checked, no. The scope of the license to Redfin is explicitly by Actress, so narrow that it excludes the ability to authorize social sharing. So the question would only come up if the court accepts Redfin's argument that it has this broader license, but in terms of whether Actress licensed it or not. Okay, if it has this broader license, then would you agree that it is consistent for people to, and the fact that I then choose to use it for something weird like my class project or whatever, then that would not be on Redfin. That would be on me. It's even more sweeping than that. Well, I think Actress has the power to grant sublicenses. Redfin says it steps into the full measure of Actress's power. That would include the power for Redfin to grant sublicenses. So it's the power to use and to authorize the use. So under Redfin's reading, there can be a long chain of people, each of whom is carrying the same copyright forward automatically. So Actress completely loses control. But the answer to your question is, if Redfin has the full measure, and this is the argument that Redfin made in its first motion for summary judgment, that if it were to be able to step into Actress's power, it could authorize social sharing. It would have authority to change the copyright management information. It would have this full power. And so if they have that broad license, it does answer most of the problems. But it creates a world of problems for Actress. And I want to address this point that Redfin has brought up, where they claim that their interpretation is necessary for Actress to work. And it's actually completely the opposite. Actress needs to be able to change its rules to kick people out, to limit narrow scope over time or expand scope. And they cannot do that if any license they touch grants an irrevocable copyright license for the full database. If you look at Rule 7.12, it says it describes the license from Actress to its members. And it uses the concept that it's revocable. This is sort of a key part, and it may be even a contextual definition of the word licensee, that it's talking about a revocable, limited kind of arrangement. And unless Actress can limit the ability of this data to get out over time, its essential purpose does not work. It does shield people from copyright suits, but destroying copyright is not the purpose of Actress. And I want to address this idea that Actress can enforce these things better than the copyright holder. It's simply not true. For two reasons. The first is the practical one, that their penalties are very small compared to copyright penalties. And the second is that they don't hold the copyright. And only the party who holds the exclusive rights in the Copyright Act can bring a copyright suit, can get copyright remedies. So under Redfin's suggestion here, the copyright would be effectively destroyed. Strass would not be able to sue. Actress would not be able to sue. We think the better reading of these agreements, especially Rule 7.10, is that it gives Actress a license and lets it do sub-licenses, and that that is consistent with our copyright suit. Nicely done. You get the zero right on the nose. All right. Thank you, Counsel, for the argument in your case. Briefing in the argument case. Interesting case, to say the least. This concludes the cases we have to be argued. We have a couple of non-argued cases which we will consider. To sum up, I want to thank the students for coming today and hanging in there through the full morning. As you see, the grist of what we do is great variety of subject matter. You have really had a full swing between criminally related cases, diversity of jurisdiction. Not all cases that we hear have constitutional issues in it. Some do. Diversity. Our three states are Texas, Louisiana, and Mississippi. So we had a diversity case. I'm not sure they know what diversity is in that. It has a different meaning in some places. All right. Point well taken. We are a court of limited jurisdiction. When I go in Sam's or Walmart, somebody who has known me forever wants to ask me either how many people are locked up today or what's the most interesting divorce case you had, judge, or whatever. And I'm like, hold them up. That's not what we do. And then, you know, we're at cocktail. Some bankers are asking about something that's equally weird, and I have to explain. No, the problem we had today was this complicated contract that these sophisticated people negotiated, and now they don't agree with what it means, so they want us to tell them what they meant when they iterated, and they had high-powered lawyers when they did it.